IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:20-CR-00029-M-3

UNITED STATES OF AMERICA )
)
v. )
) **OPINION AND ORDER**
ITALIA WILLIAMS, )
Defendant. )

This matter is before the court on Defendant Italia Williams' (hereinafter "Defendant" or "Williams") Motion to Suppress and Incorporated Memorandum of Law [DE-73]. Williams moved to suppress all evidence discovered as a result of a traffic stop in Wilmington, North Carolina, on July 23, 2019. An evidentiary hearing was held on September 3, 2020. Prior to the hearing, the court conducted an in-camera review of relevant police officer body camera footage. At the conclusion of the hearing, the court announced the denial of Defendant's motion and provided the key factual findings underpinning the decision. This written order follows and explains in greater detail the reasons for the motion's denial.

I.  Procedural History

Williams was indicted on February 26, 2020, along with two co-defendants, Marlon Porter and Raymond Kennedy. DE-1. Williams was personally charged with (1) conspiracy to possess with the intent to distribute heroin, cocaine, and cocaine base (crack), in violation of 21 U.S.C. §§ 846, 841(a)(1) ("Count One"), and (2) possession with the intent to distribute a quantity of heroin, in violation of 21 U.S.C. § 841(a)(1) ("Count Four"). *Id.* Williams was arrested on March 5, 2020 [DE-27], and had her Initial Appearance before Magistrate Judge Jones the next day [DE-20]. Her Detention Hearing was held on March 19, 2020, and the court granted the Government's motion for pretrial detention [DE-44; DE-47]. Williams was granted several continuances for her

1

arraignment [DE-52; DE-64; DE-69; DE-96], which is currently scheduled for the court's October 6, 2020, term of court [DE-96]. Williams filed her motion to suppress on July 13, 2020 [DE-73]. After being granted an extension of time to file a response [DE-76], the Government filed its opposition on August 26, 2020 [DE-92]. An evidentiary hearing on the suppression motion took place on September 3, 2020 [DE-93].

II.     Factual Findings

The court derives the following facts from testimony and evidence presented at the evidentiary hearing and the relevant police officer body camera footage submitted to the court.[1] Deputy Miller engaged his patrol car signals at 10:58 pm and initiated a traffic stop at 10:59 pm in Wilmington, North Carolina, on the evening of July 23, 2019. Ex. C. After obtaining preliminary information from Williams—her name, that she was driving a truck that belonged to a friend, and that she did not have a driver's license—Deputy Miller returned to his patrol car to verify Williams' identity at approximately 11:00 pm. Ex. C; Suppression Hr'g Tr. 19:11-25, DE-97 (hereinafter "Hr'g Tr."). He did so by searching various databases, including "P2P," "CJLEADS," and "NCIC," also known as "NCAWARE." Hr'g Tr. at 20:4-25. Deputy Miller's investigation was "more difficult" because Williams was unable to provide proof of identification or a valid driver's license. Hr'g Tr. 21:9-15. Searching the various databases took several minutes. Hr'g Tr. 24:22-

---

[1] Exhibit A is body camera footage from the July 23, 2019, encounter with Williams from the perspective of Officer J.M. Winesette (hereinafter "Ex. A"). Exhibit B is body camera footage from the July 23, 2019, encounter with Williams from the perspective of Officer K.J. Murphy (hereinafter "Ex. B"). Exhibit C is body camera footage from the July 23, 2019, encounter with Williams from the perspective of Deputy J.R. Miller (hereinafter "Ex. C"). The time indicated in Exhibits A through C is Eastern Standard Time advanced by four hours, i.e. 3:01 am on July 24, 2019, is 11:01 pm on July 23, 2019, in local time. Exhibit D is Deputy Miller's CAD notes from the July 23, 2019, encounter with Williams. Exhibit E is the Certificate of Certification in Narcotics Detection for Officer Murphy and her K-9, Dex, dated January 25, 2019. Exhibit F is Officer Murphy's K-9 Resume. Exhibit G is Officer Murphy's CAD notes from the July 23, 2019, encounter with Williams.

2

25:5; Ex. C. After reviewing Williams' criminal history and discussing it with Officer Winesette, who arrived on the scene at 11:01 pm, Deputy Miller requested a K-9 Unit at 11:06 pm. Ex. A; Ex. C; Hr'g Tr. 24:22-25:14. One minute later, Deputy Miller again approached the truck to confirm Williams' current address to ensure that any citation he issued would be sent to the correct location. Ex. C; Hr'g Tr. 25:15-26:12. Deputy Miller returned to his car to get ready to begin writing the citation through the "eCitation" platform. Ex. C; Hr'g Tr. 27:5-12. This process also involved plugging in a printer, via two cables, and testing the printer. Ex. C; Hr'g Tr. 27:13-28:11. While beginning the citation-writing process, Officer Murphy arrived on the scene and approached Deputy Miller. Ex. B; Ex. C; Hr'g Tr. 28:15-24. At 11:10 pm Officer Murphy specifically asked Deputy Miller what he had left to do regarding the traffic stop. Ex. B; Ex. C. Deputy Miller responded "I still need to write the citation." Ex. B; Ex. C. Because Williams did not provide a driver's license, the "eCitation" platform could not auto-populate the various fields necessary for the citation. Hr'g Tr. 29:11-30:10. Instead, Deputy Miller had to manually input all of the necessary information and then had to quality check the information, navigating between several screens to make sure the information was accurate. *Id.*; Hr'g Tr. 30:11-21. At 11:13 pm Deputy Miller was still populating fields for the citation. Hr'g Tr. 30:11-14. At this same time, Officer Murphy was beginning the dog sniff, having already asked Officer Winesette to have Williams moved to a nearby sidewalk, closed the car doors, retrieved the dog leash, and retrieved the dog, Dex. Ex. A; Ex. B. Dex alerted twice at 11:14 pm and Officer Murphy relayed this to Deputy Miller at 11:15 pm. Ex. B; Ex. C; Hr'g Tr. 30:22-31:7. Deputy Miller was still writing the citation at 11:15 pm when Officers Murphy and Winesette proceeded with the search of the truck. Ex. B; Ex. C; Hr'g Tr. 30:22-31:7.

III. Analysis

Williams, as the driver, had a reasonable expectation of privacy in the truck she borrowed from a friend and its contents, even though she was not the owner, and therefore had her personal Fourth Amendment rights implicated by her seizure and the search of the truck and her person. Therefore, she may challenge the traffic stop and the subsequent warrantless search of the truck. *See United States v. Rusher*, 966 F.2d 868, 874 (4th Cir. 1992), *cert. denied* 506 U.S. 926 (1992) (finding the defendant had a reasonable expectation of privacy in the truck he was driving and its contents despite the fact that he was not the owner, where there was no evidence to show that the possession was illegitimate). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). The parties do not contest that the traffic stop was justified at its inception due to expired tags, which is a violation of North Carolina law. N.C. Gen. Stat. § 20-111(2). Also, Williams does not challenge any of the officers' actions after the dog alerted or that the dog alert itself constituted probable cause to search the vehicle. The question this case presents is whether or not the traffic stop was complete prior to the dog sniff. If it was, and the stop was extended or prolonged absent reasonable suspicion in order to conduct a dog sniff, a Fourth Amendment violation occurred and exclusion of the evidence obtained as a result of the violation is the appropriate remedy. *See, e.g., United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014). In this case, the officer writing the ticket did not extend the traffic stop in any way, so the seizure was not unlawfully extended under the Fourth Amendment. The dog alert took place during the lawful traffic stop and provided probable cause for the subsequent search and arrest. The drugs ultimately at issue were found in a search incident to a lawful arrest.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness. To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (internal quotations and citations omitted).

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996) (citations omitted). "Because an ordinary traffic stop is 'a limited seizure more like an investigative detention than a custodial arrest,' we employ the Supreme Court's analysis for investigative detention used in *Terry v. Ohio*, 392 U.S. 1 [ ] (1968), to determine the limits of police conduct in routine traffic stops." *United States v. Guijon–Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (quoting *Rusher*, 966 F.2d at 875). "Under *Terry*'s 'dual inquiry,' after asking whether the officer's action was 'justified at its inception,' we ask whether the continued stop was 'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *Id.* (citations omitted).

The traffic stop's mission usually encompasses checking the driver's license, determining whether there are outstanding warrants against the driver, inspecting the automobile's registration and proof of insurance, and determining whether to issue a traffic ticket. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356. However, the Supreme Court has clearly held that where a lawful traffic stop is not extended beyond the time necessary to issue a warning ticket and to conduct ordinary inquiries

5

incident to such a stop, another officer's arrival at the scene to conduct a dog sniff does not have to be supported by some reasonable, articulable suspicion. *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.").

However, this is not the case if the mission of the traffic stop has been completed. Ten years after the *Caballes* decision, the Supreme Court in *Rodriquez v. United States*

> held that, absent reasonable, articulable suspicion of criminal activity, a detaining officer may not extend an otherwise-completed traffic stop in order to conduct a dog sniff. The Court emphasized that, under *Terry*'s second prong, the "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." In other words, to extend the detention of a motorist beyond the time necessary to accomplish a traffic stop's purpose, the authorities must either possess "reasonable suspicion or receive the driver's consent."

*United States v. Williams*, 808 F.3d 238, 245-46 (4th Cir. 2015) (citations omitted).

"As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citations omitted). "If a defendant shows that he was subjected to a warrantless search, the burden of proof is on the government to show by a preponderance of the evidence that the warrantless search was constitutional." *United States v. Miller*, No. 4:18-CR-54-FL-1, 2020 WL 3886301, at *8 (E.D.N.C. Jan. 13, 2020); *see also United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013). The driver of a borrowed truck has a reasonable expectation of privacy in it and its contents though he is not the owner where there is no evidence tending to show that the possession was illegitimate. *Rusher*, 966 F.2d at 874.

6

Three law enforcement officers present at the scene during the Williams traffic stop, each arriving at varying times, bore principal responsibility for distinct tasks during the course of the traffic stop. Deputy Miller was the police officer who initiated the traffic stop. Ex. C; Hr'g Tr. 13:9-15. He engaged his signals at 10:58 pm and approached the pulled over truck one minute later to investigate expired tags. Ex. C; Hr'g Tr. 12:15-13:15. Officer Winesette arrived at the scene at 11:01 pm and spent most of his time conversing with Williams while she sat inside the truck. Ex. A. Officer Winesette ultimately directed her to step outside of the vehicle just prior to the dog sniff. Ex. A. Officer Murphy arrived on the scene at 11:09 pm, three minutes after the request for a K-9 Unit was placed, and had brief exchanges with Deputy Miller and Officer Winesette about the situation before beginning the dog sniff. Ex. A; Ex. B; Ex. C; Hr'g Tr. 49:10-50:13. At 11:10 pm Officer Murphy specifically asked Deputy Miller what he had left to do regarding the traffic stop. Ex. B; Ex. C. Deputy Miller responded, "I still need to write the citation." Ex. B; Ex. C. Officer Murphy then proceeded to take the necessary steps to conduct the dog sniff including asking Officer Winesette to have Williams move to a nearby sidewalk, close the car doors, retrieve the dog leash, and retrieve Dex. Ex. A; Ex. B; Hr'g Tr. 50:12-51:6. During the fifteen-minute period between the initiation of the traffic stop and the first dog alert, the only things that took Deputy Miller away from his work on the mission of the traffic stop were his request for the K-9 Unit and his brief conversation with Officer Murphy after her arrival on the scene. Ex. C. At most, these activities took up less than one minute of his time. Ex. C. Because the evidence shows that the traffic stop was not complete prior to the dog sniff, this case squarely fits under *Caballes* and was not prolonged under circumstances present in *Rodriguez*. Furthermore, the touchstone of the Fourth Amendment is reasonableness of the officers' actions, *Heien*, 574 U.S. at 60-61, and in this case, all three officers, but especially the citing officer, acted reasonably under the circumstances

and diligently to pursue their distinct tasks during the encounter with Williams. No Fourth Amendment violation occurred in this case.

IV. Conclusion

For the reasons discussed above, the Defendant's Motion to Suppress and Incorporated Memorandum of Law [DE-73] is DENIED.

SO ORDERED this the 14th day of September, 2020.

*Richard E. Myers II*
RICHARD E. MYERS II
U.S. DISTRICT COURT JUDGE